

ORIGINAL

Thomas Reedy
c/o Southwest Legal Services
P.O. Box 57091
Tucson, Arizona  85732

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | **4-07CV-024-Y** |
|        ) | Case No. 4:00-CR-054-Y |
|     Plaintiff/Respondent,    ) | |
|        ) | |
|       vs.    ) | Civil No. _____ |
|        ) | |
| THOMAS REEDY and JANICE REEDY,    ) | MEMORANDUM IN SUPPORT |
|        ) | OF PETITIONS TO VACATE |
|     Defendants/Petitioners.    ) | SENTENCES (22 U.S.C. § 2255) |
|        ) | |

## STATEMENT OF FACTS

1.    In 1997 Thomas and Janice Reedy owned and operated Landslide, Inc., a new

company engaged in what is called the AVS, or Adult Verification Service, business on

the Internet. AVS companies came to be as a result of legislation passed by the U.S.

Congress in the 1990s which required Internet pornography vendors to verify that their

customers were at least 18 years old, and which provided that one acceptable means of

making such a verification was to establish that the customer had a valid credit card.

2.    Because Internet buyers have traditionally been loath to disclose their private

credit card numbers to pornography vendors, AVS's became the middlemen who receive

the credit card information, verify and collect the costs of the transaction, and then give

the customers entrée to the pornographic websites.  In return for providing these services,

the AVS companies retain a percentage of the fees charged by the websites. Many AVS

1

companies exist and thrive today.   Landslide actually had two AVS systems: the first, referred to throughout the trial as "AVS," gave the customer access to thousands of websites for a limited time for just one fee; the second, referred to as "KeyZ" at trial, gave the customer access to only one site for a limited time for one fee.

3.      Landslide was profitable from its very beginning, and over the few years of its existence it steadily grew larger and more profitable. By August 1999, it had approximately 5,700 website clients on its systems, and it had close to one and a half million dollars in its bank accounts.

4.      The vast majority, if not all, of the company's client webmasters operated websites that offered legal adult pornography to their customers.  These clients were able to signup with Landslide over the Internet, and the entire procedure was automated, normally requiring no personal contact between the company and the webmasters who used its services.

5.      Given the large number of websites that used Landslide as their AVS, it was inevitable that a few would eventually be found to include illegal images of children among their offerings.   Such sites would typically come to the attention of Landslide when a customer visiting the site would be offended, and would notify Landslide of the illegal content.   Thomas Reedy would then view the website, and in most cases would find that the content was in fact adult, and legal.   He would then notify the customer to that effect, and suggest that the customer notify his or her local law enforcement agency if the customer wished to pursue the matter.

6.      On the few occasions when Reedy believed that the reported content was in fact

2

illegal, i.e., child pornography, he promptly notified the Webmaster to remove the illegal content. If the Webmaster failed to do so, Landslide removed the offending website from its system. On a few other occasions, Landslide received requests from law enforcement agencies for information about Webmasters who were being investigated for illegal content. In each such instance, Landslide cooperated fully with the police.

7.      In August of 1998 Landslide had been contacted by F.B.I. Agent Frank B. Super, who was seeking help with an investigation out of the FBI's Hong Kong Office involving the unauthorized use of a credit card belonging to the Chief of Police in Sri Lanka. Thomas Reedy had cooperated with Agent Super, and retained his business card after their initial contacts.

8.      By late 1998 the incidence of illegal postings on websites serviced by Landslide had increased, and although they involved only a tiny fraction of one percent of the websites on the Landslide system, Reedy was noticing repeat offenders. Aware that his prior methods were not adequately preventing reoccurrences, he called up Agent Super— the only FBI Agent he had an acquaintance with—and told Super about the most recent incident of child pornography that Reedy had discovered. He explained to Super how he had been dealing with such cases, by disconnecting the offending website, and asked Super if he should do the same this time.

9.      Agent Super said no. Instead, he told Reedy that the FBI was then in the process of organizing a child pornography task force in the Dallas-Fort Worth area, and he asked Reedy to leave the website alone and not to do anything to tip off the Webmaster. He said that it would still be *at least* several months before the task force was operational, and that he would report the matter to the task force as soon as it was ready. He also told

Reedy that the task force would get in touch with him at that time, in order to open an investigation.

10.     Reedy did as the agent had asked, and left the site alone.   Over the following months he noticed an increase in reports of illegal images on a few sites, but he continued to wait for the new Dallas/Fort Worth Child Pornography Task Force to contact him.  He was aware that the increase in such sites was possibly due to Landslide's failure to force the removal of the images that he had already discussed with Agent Super, and thought that the Task Force would eventually be going after them.

11.     In early 1999 Landslide, Inc. also had what is called a rotating banner system in place.  This was an automated system that allowed webmasters who subscribed to place their own banner ads on a continually "rotating" (or changing) system, which featured each such ad in a continual sequence as customers or prospects visited participating websites.   The effect of this system was to allow many webmasters to advertise their offerings on each other's websites, thus generating more business for all of them.  (Pop-up ads are used in a similar manner today.)

12.     By the Spring of 1999 Thomas Reedy had noticed that there were recurring instances of banners being posted which offered illegal content on the sites they led to, or which took customers away from the Landslide system to competing AVS websites. Initially he tried to police those banners and made the webmasters remove them, but the problem quickly grew to the point where he decided to close down the banner system, and he did so.

13.     Landslide had also started a classified ad forum, in which customers could post personal classified ads without cost.  This system too became a problem, with ads that

4

appeared to be making illegal offers (many of which Reedy suspected were placed by police, out to trap naive pedophiles) and others that offered free passwords to sites that used Landslide as their AVS, thus cutting into the company's revenues and offending the affected Webmasters.  Sometime in the Spring or early Summer of 1999 Landslide closed down the classified ad forum as a result of these concerns.

14.     Because of the increase in the number of complaints that Landslide was receiving about the content of some websites, some company employees expressed concern about those websites.   Thomas Reedy told them that he was already working with the FBI in the matter, and that there was nothing to worry about.  Because Reedy usually worked at home, much of this communication took place by email.

15.     On September 8, 1999, agents of the FBI, the U.S. Postal Inspection Service, and other police agencies, raided the offices of Landslide, Inc., and the home of the Reedys. They seized computers and other evidence, and interviewed the Reedys and other employees of Landslide.   On April 12, 2000, The Reedys and Landslide were indicted on multiple counts, and the Reedys were arrested on April 13th.  At the same time, the prosecution seized the available cash in bank accounts and other assets of Landslide and the Reedys.

16.     This case went to trial on November 27, 2000, and ended with multiple guilty verdicts on December 1st.   Thomas Reedy was sentenced to 1,335 years in prison at his initial sentencing  That term was later reduced after appeal, but the reduced sentence is still equal to several normal lifetimes.

17.     Between the initial raid on the Landslide and Reedy premises, September 8th, 1999, and the arrest of the Reedys the following April, the Reedys sought defense

counsel in case they should be indicted.   Initially they met with the law firm of their first choice, and were told that they had a case that could be won, but counsel wanted $400,000 as their fee.   The Reedys could not afford that amount, and they ultimately retained Wes Ball to defend Thomas and Michael Heiskell to defend Janice.   Ball and Heiskell represented the defendants at trial (for a much lower fee).

18.     In the months between arrest and trial Thomas Reedy discussed the facts set forth above with Wes Ball.   He also provided Mr. Ball with back-up tapes of the hard disks used by Landslide as of September 8, 2000, and he explained to Mr. Ball as many of the technical intricacies of the computers and Internet as Ball would allow.   He also spent some time with Mr. Ball preparing to testify at the trial, expecting right up to the final moment that he would be testifying.

19.     The most significant evidence presented at the trial is set forth in the following paragraphs.

**DET. STEVEN NELSON**

20.     At trial, the government's first witness was Detective Steven Nelson of the U.S. Postal Inspection Service.   Det. Nelson testified that he had just been assigned to an Internet Crimes Against Children Task Force when he was asked by Inspector Bob Adams to look at a particular website.   That site, variously referred to as "Kintamani" and "Lolita World," used Landslide as its AVS gateway.

21.     Detective Nelson described spending many weeks finding and recording child pornography images on websites that he accessed through the Landslide AVS and KeyZ services. He also testified that he visited 28 sites on the KeyZ system, found child pornography images on all 28, but only recorded the images from 12 of those sites.  (TT

pp 279-280)  He also testified that he worked by himself throughout this period.  (TT 162)

22.      Nelson also testified that he found a banner ad reading "CLICK HERE CHILD PORN" on the Landslide home page, the Landslide AVS home page, and the Landslide adult classified home page.  (TT pp 170-171, 210, 300-302)  He also testifies that the "ENTER" and "EXIT" buttons shown directly beneath the banner on his exhibit (SN-A-1) are there to access or exit the child porn offered by the banner.

23.      Finally, Det. Nelson testified that the "CLICK HERE CHILD PORN" is also on the Lolita World home page.

**MICHAEL THOMAS MARSHALL**

24.      Mr. Marshall was the Chief Investigator for the Internet Bureau for the Attorney General of Texas when he testified at trial.  (TT p. 344)  He testified that he worked for Microsoft during the early stages of the investigation of this case, and that he was the one who helped Det. Nelson with the technology that Nelson ultimately used to record the web sites and present the evidence in court.

25.      Mr. Marshall testified about the ways that banner ads work, and he told the jury that they would not normally be freely allowed on websites belonging to others. (TT pp. 349-350)

26.      Marshall also acknowledged during cross examination that he recalled Wes Ball, the defense attorney, when Ball stated aloud that he (Ball) must have met Marshall while working as a prosecutor in Fort Worth years earlier.   Marshall did not volunteer that Wes Ball had once been his own defense attorney.  (TT p. 355)

27.     During cross examination by Michael Heiskell, Mr. Marshall testified that he had worked on patrol and investigating hit and run accidents while on the Fort Worth P.D. He did not mention that he had also worked on the vice detail while on the F.W.P.D.

**DANE RITCHESON**

28.     Mr. Ritcheson was a forensics examiner for the U.S. Postal Investigation Service. He testified about e-mails back and forth between Thomas Reedy and a Webmaster called "Miranda" that they had found, in which Tom Reedy had insisted that there must be content on Miranda's websites. (TT pp. 469-472, 503-504)  This testimony was later misinterpreted and embellished by Terri Moore, the U.S. Attorney, to mean that Reedy was complaining about there not being enough child pornography on Miranda's site; when in reality Reedy was complaining that there was no content at all on the site, thereby defrauding customers who had purchased entry in good faith.

29.     Mr. Ritcheson also testified that he had examined the hard drives of all five computers taken from Landslide, and that he did not find any references to contacts by Reedy with law enforcement agencies anywhere on those computers. (TT p. 480)

30.     He identified pornographic images of children that he had found in a notebook computer taken from the Reedy residence, (TT pp. 482-484) and he presented 30 pages of printed listings from the classified ads section of the Landslide website. (TT pp. 484-485)

31.     He also testified about emails back and force between Janice Reedy and a Webmaster known as superslammer2@usa.net regarding monies due to him, and charge-backs being experienced by Landslide.

32.    He testified about several other emails that he had found between Landslide and various Webmasters, discussing the contents of the site(s) or matters concerning payments due to the Webmasters.   In none of the emails did the defendants ever ask for or discuss child pornography on the sites.

33.    He also testified that he found the CLICK HERE CHILD PORN banner captured by Steve Nelson duplicated on the Sun 1 computer taken from Landslide; and that the banner captured by Nelson was on the Lolita Hardcore website.  (TT pp. 513-514)

34.    On cross examination, Mr. Ritcheson testified that the CLICK HERE CHILD PORN banner was physically resident on the Miranda sites when they did the Web Buddy copying (TT pp. 523-526); that Landslide had disabled the banner swap program (TT p. 529); that he had actually searched 23 computers and six tapes for evidence that Landslide had reported child images to police organizations, (without finding any); and that the email from Tom Reedy about lack of content did not specifically say for the Webmaster to put more kiddy porn content on the site, but "It's your interpretation of how you read that e-mail."

STEED HUGGINS

35.    Another U.S.P.I.S. Inspector, Mr. Huggins was the supervising agent on this case. He helped execute the search warrant at Landslide and he helped interview Janice Reedy that same day.  He later participated in an interview of Thomas Reedy, and he attributed several statements to Mr. Reedy in which, he said, Reedy had admitted that he and other principals at Landslide all knew that they had child pornography on their system.   .

36.     Mr. Huggins stated that Thomas Reedy said he would view the child pornography when it was brought to his attention via a complaint.  He would then advise the customer to contact their local [law enforcement] and he would leave the site running.

37.     On cross examination, Huggins acknowledged that Thomas Reedy had said that he did not review the sites when they signed up.  He only reviewed sites when he received complaints about them.  (TT p. 604)   He also admitted that Reedy had told them that he (Reedy) never posted any child oriented sites (TT pp. 606-607); he always referred complainants to law enforcement (TT p. 607); and that Reedy had told them that he had had prior contact with Frank Super, a local FBI Agent.  (TT p. 608)

38.     Mr. Huggins also acknowledged that in his memorandum of the interview, created shortly after the fact, he said that Thomas Reedy had stated that perhaps 30-40 sites contained some child pornography.  Reedy also had said that his best webmasters were those that he sent international wire transfers to (not those that featured child pornography, as Higgins had testified on direct.)

**FRANK B. SUPER**

39.     F.B.I. Special Agent Frank Super testified as a defense witness, after a last-minute decision by the prosecution not to call him to the stand.

40.     Agent Super testified that he first came into contact with Landslide about August of 1997 when he received a report of child pornography on a site called Child God, which was accessible through Landslide.  Thomas Reedy had cooperated fully, and when they learned the site was from Indonesia he and his boss had referred it upward but did not think that there was anything more for them to do.  Super described this initial encounter, in August 1997, in detail.  He testified that he first went to a building on the south side of

Belknap Street, and was then referred to the building across the street, on the north side, where he found and spoke to the Office Manager, Carol Clark.  He also said that he had told Thomas Reedy about a nationwide effort called Innocent Images targeting child pornographers.  (TT pp. 668-674)

41.     A year later, according to Agent Super, he returned to Landslide and again spoke to Carol Clark.  This time he was following up on an inquiry that the FBI had received from their Hong Kong Office.  It concerned the unauthorized use of a credit card belonging to the Chief of Police of Sri Lanka to purchase pornography. (TT p. 674)

42.     He also testified that Thomas Reedy had called him up and asked if he got everything he needed from Carol Clark.  (TT p. 675)

43.     Super said that there was no official complaint form on the initial inquiry which he made in 1997, (TT pp. 676-677) and he acknowledged that he had never advised Landslide to stop doing the business that they were doing.

44.     On cross examination, Agent Super testified that he had only been with the Bureau a few months at the time of his initial contact in 1997, but it didn't look to him like there was anything illegal being done by Landslide.  He also discussed it with his supervisor, who had 13 years experience, and his supervisor hadn't seen any illegality by Landslide either.  (TT pp. 679-680)

45.     He was then asked, By Terri Moore, "Did you have a clue that he would sometimes chastise a Webmaster for "lack of content" if customers complained that it wasn't dirty enough?" to which he answered "No."  Although this question imputed a fact not in evidence, there was no objection to it made by defense counsel.

46.     Ms. Moore then elicited testimony from Agent Super to the effect that he thought that Thomas Reedy might prove to be a good source in the future, but that Reedy had never called again.  (TT pp. 6820683)  The most critical exchange was this:

Q.     Did he call you ever, Agent Super?

A.     No. I never had any contact with him between the August '97 time period until I had a lead from Hong Kong and he called and said did you get what you needed and, yes, thank you.  Other than that, nothing.

Q.     But not one time did he ever pick up the phone and call you and say, hey, this is what's going on.  There is child pornography.

A.     No, he never called.

Q.     Not one time.

A.     No.

(TT p. 683)

47.     This testimony directly contradicted the story of the defendant Thomas Reedy, who claims that he did call and report the child pornography to Super, and that Super instructed him to sit tight and wait for the new Task Force to become active and contact him.  In doing so, it undercut the best the defense the defense had to offer.   As will be shown later, Frank Super, like most of the agents before him, was lying.

## CLOSING ARGUMENTS

48.     The strongest points made in her closing argument by A.U.S.A. Terri Moore for the prosecution were these:

a.     The next piece of evidence that is indicative that
       there is an agreement is look at the banners that were
       found on the Sun system. I think it's under Sun in

12

these folders up here, Sun 1, Sun whatever. The Sun series. That's the computer out at the business, and you will see "For Child Porn Click Here." You'll see that banner. You will see the Fling Little Kids banner. That's on their computers. Well, those very same banners are found on the home pages, the home pages, of these webmasters. Lolita World, at the bottom, "For Child Porn Click Here."

And what happens when you click here for child porn? It takes you right back to Landslide so you can pay you money. That is evidence of an agreement between these people. It's also evidence of knowledge of what's going on.  (TT p. 858)

b.  How do you know that they knew that they were involved in the distribution or transportation of child pornography? Well, the first big piece of evidence that you have is they said they knew. It came from their own mouths that they knew, and which witness told you that? Inspector Steed Huggins told you that. What did Steed tell you? He said that Thomas Reedy came to the United States Attorney's Office, he sat there flanked by two lawyers, okay, and there were other inspectors in there as well and he said he knew it. He said Janice knew it. He said his brother ion knew it, he said -- Who else knew it? He said Tom Hughes knew it. They all knew it. They knew what they were doing. They all knew it, and you know that because it came from his own mouth. (TT p. 861)

c.  You know, they got up here in their opening statements and they got up here in their voir dire and talked about, oh, they're just the ticket taker at a movie house. Well, you know, the ticket taker may not know what movie is on. We've proven to you that these people know. These people know what is going on here. The banners, the banners, you know, that's  not some banner swap thing. That banner would not be residing, the "Child Porn Click Here" banner would not be residing on the server at Landslide's business unless it was his banner. Okay. (TT pp. 895-896)

49.     This presentation by the Government was sufficiently powerful so as to cause the trial judge to sentence Thomas Reedy to more than one thousand three hundred years in prison, with the explicit intent that he die in prison.

50.     Not long after the guilty verdict in this trial, a puff piece appeared in print lauding Michael Marshall for his role in the prosecution.   Unexpectedly, many good Fort Worth policemen have long memories, and several persons contacted Terri Moore to tell her about the more unsavory aspects of Marshall's character.   She was told that Marshall had been forced off of the Fort Worth Police Department years earlier, under suspicion of extorting prostitutes for sexual favors.   He was also the prime suspect in the murder of a prostitute, and he had actually been convicted of two felonies at the time.

51.     When Moore asked Marshall about these allegations, he admitted them.   But he also explained that he had not told her about his prior felony convictions because they had been expunged, and he thought that that excused him from such disclosures.   In fact, only one of the convictions had been expunged.

52.     It was then discovered that Thomas Reedy's defense attorney, Wes Ball, had actually represented Michael Marshall in his troubles years prior, but had forgotten about him with the passage of time.   When Ball, obviously confused, suggested to Marshall during the trial that they must have met while Ball was working as a prosecutor, Marshall let that misconception stand.

53.     After the completion of the Landslide trial, principals from the prosecution side went on to greater glory.   Terri Moore left the U.S. Attorney's Office and has twice run for District Attorney in Fort Worth, claiming her great victory in the Landslide trial as

evidence of her worthiness for that office.  The police who worked on the case also exploited their fame:  they began to circulate lists of names of the customers who had accessed websites through the Landslide Keyz system to other police agencies around the world, telling the other police that these individuals were pedophiles who had been accessing child pornography through Landslide.

54.     Many police departments in other jurisdictions, particularly in Canada and Great Britain, took the word of the American officers at face value, and a great many arrests and public investigations ensued.   The police in Great Britain, for example, obtained search warrants for thousands of men based solely on the affidavits of Steve Nelson and other American officers that the named men had accessed websites through Keyz, and that all the websites on KeyZ were child pornography sites.   As a result, thousands of innocent lives were uprooted, families destroyed, and reputations ruined.  There were also many suicides, by men who feared there was no way they could fight the accusations, true or not.

55.     The sheer numbers of victims of the mass police hysteria in Great Britain had a side effect, however:  there were those innocent beings with the courage and willpower to stand and fight.  Eventually their numbers swelled, as they made inroads into the pornographic police madness that engulfed them.  Instead of merely rolling over and taking quick "deals," as many others had, more than a few insisted on their day in court, and, as the cases began to be heard, with competent defense counsel, it became clear to many British Courts that most of the "facts" testified to by the American officers that had set off the prosecutions were in fact false, and that the American officers had been lying.

**STATEMENT OF THE ISSUES**

56.     Thomas and Janice Reedy argue that their convictions and sentences were the result of a trial which suffered from two major fatal flaws, each a violation of their Constitution Right to a fair trial.  First among the two was gross governmental misconduct, in the form of false testimony by law enforcement officers who testified for the prosecution.  The second major Constitutional error was ineffective assistance of counsel, in that defense counsel failed to adequately investigate, prepare, and present the defense(s) which the defendants had discussed with them; and they failed to expose to the judge and jury the many falsehoods told by law enforcement officers and the U.S. Attorney, Terry Moore, during the course of the trial.   This Motion also presents newly discovered evidence which supports the Petitioners' cause, principally evidence from American law enforcement sources which contradicts the testimony of the police in the Landslide trial, and that only came to light in the context of the trials in Europe.

**FALLACIES IN THE PROSECUTION'S CASE**

57.     For the sale of simplicity, this portion of this Memorandum will address the prosecution's case, as previously presented, on a paragraph by paragraph basis.  This Memorandum is also accompanied by the affidavit of Larry Fassler, who was retained to assist in this case by Forrest Reedy, the father of Thomas Reedy.   References to that affidavit in the following paragraphs will be cited as "Affidavit ¶ X".

58.     Det. Steve Nelson testified to spending many weeks reviewing and recording web sites accessed over the Landslide systems.  He testified that he worked alone, and reported his results to Postal Inspector Bob Adams. He claimed to have visited 28 sites,

found child pornography on all 28, but only recorded the images from 12 of the 28 sites. This entire story appears to be false, because U.S. Postal Inspection Service Inspector (retired) Michael Mead has more recently testified under oath in the courts of Great Britain that he was the person who did the reviews of the suspect websites. Mr. Mead only came forward with his testimony after Inspector Nelson's credibility had been irreparably damaged in the British courts. If Mead told the truth to the British courts, then perforce Steve Nelson lied at the Landslide trial. Affidavit ¶ 6.

59.      Nelson also testified that he found a banner ad reading CLICK HERE CHILD PORN on the Landslide homepage; the Landslide AVS homepage; and the Landslide adult classified homepage. All of these statements are false, as the banner ad in question was *never* on the landslide homepages. Moreover, the exhibit presented by Mr. Nelson, purportedly showing the banner ad on the homepage, is not an image of the Landslide homepage, and may in fact be a manufactured exhibit falsely represented to have come off the Landslide website. Affidavit ¶ 7.

60.      Michael Marshall concealed from the prosecutor, defense, and the court that he had been previously convicted of two felonies, and had been forced off of the Fort Worth Police Department for very serious misconduct. He also evaded an opportunity to identify himself to the defense counsel during the trial, instead choosing to let Mr. Ball continue to think that they had previously met when Marshall was a policeman and Ball was a prosecutor. Marshall was also the most "expert" of the various computer experts presented by the prosecution, and he testified that he had "helped" Det. Nelson with the technology that Nelson claimed to have used to record the web sites that he presented to

the jury.  If in fact the banner ad exhibit presented by Nelson was faked, it is likely, given Marshall's known deceptions during the trial, that he also had a hand in that fakery. Affidavit ¶ 8.

61.    Mr. Marshall testified about the ways that banner ads work, and he told the jury that they would not normally be freely allowed on websites belonging to others.  In fact they *would* normally be allowed on websites belonging to others, and they did *not* work in the manner described by Mr. Marshall.   If Mr. Marshall was not lying when he testified, then he was misrepresenting himself as an expert on the subject. Affidavit ¶ 9.

62.    Dane Ritcheson testified that he had searched he hard drives of all the Landslide computers looking for evidence of police contact by Thomas Reedy about child images on websites, and had found none.  In fact such evidence, in the form of emails mentioning the cooperation with the FBI, did exist on those hard drives.  Either Mr. Ritcheson did not competently and thoroughly conduct his search, or he testified falsely about his results. Affidavit ¶ 10.

63.    U.S.P.I.S. Inspector Steed Huggins testified that Thomas Reedy had made several very incriminating statements during an interview held shortly after the September 8th searches.  According to Huggins, Reedy testified that they all knew that there was child pornography on the Landslide system.  By failing to put on the defendant, Thomas Reedy, defense counsel allowed Mr. Huggins' deceptive testimony to remain unchallenged.  In fact, Mr. Huggins misrepresented the statements that had been made by Thomas Reedy during the interview, in the same manner that he had misrepresented what Reedy had said about his best webmasters, and by allowing them to go unchallenged

defense counsel enabled Terri Moore to argue to the jury that Reedy himself had admitted a critical element of the charges against him.

64.     The Reedys' primary defense in this trial was their assertion that Thomas Reedy had contacted FBI Agent Frank Super shortly after they first met in August of 1998, had told Super about the child images, and sought his direction on what to do.  Thereafter, Landslide complied with Super's instructions, leaving the offending websites alone until the newly formed Dallas/Fort Worth Child Pornography Task Force could step in and build their cases.   That defense was completely undermined when Frank Super testified to the jury that he had first gone to Landslide and worked with Carol Clark in August of 1997, while investigating a website called Child God which was accessible through Landslide.   In reality, Agent Super's testimony was false:  the website Child God did not exist on Landslide in 1997; Carol Clark did not work for Landslide in 1997; and Landslide did not occupy the offices that Super claimed to have visited in 1997.  Affidavit ¶ 11.  Super's testimony appears to have been fabricated for the express purpose of foreclosing Thomas Reedy's true version of events, by making Reedy look to be the liar if he testified at the trial.   Instead of impeaching Super with the truth, defense counsel allowed him to undermine the Reedy's most viable defense with his outright lies.

65.     Frank Super was also asked by Terri Moore if he knew that Thomas Reedy would "sometimes chastise a Webmaster for "lack of content" if customers complained that it wasn't dirty enough?"  The question itself stated a fact not in evidence, and untrue, and was obviously designed to manipulate Frank Super, the jury, and this Court, by giving the appearance that Reedy had in fact done what Moore was stating.  That Moore did this to

Super also suggests that she was having a difficult time keeping him in line with the rest of her false evidence.  Defense counsel made no objection to the question, even though they had already been told that the "lack of content" phrase meant that the websites in question had no content at all, not that the quality of the content was lacking, and thereafter Moore argued her own invention to the jury as if it had been real evidence which came from a reliable witness.

66.     During the closing argument Terry Moore argued that the presence of the banner ad "FOR CHILD PORN CLICK HERE" on the Sun 1 computer proved that there was an agreement between Landslide and the Webmasters to broadcast the banner ad.   In fact that argument was false, and there was no valid basis for it whatsoever.   Yet defense counsel let it go unchallenged.   Affidavit ¶ 12.

67.     Ms. Moore also argued to the jury that Thomas Reedy himself had admitted that they were involved in the distribution or transportation of child pornography.   She based this argument upon Inspector Steed Huggins' testimony to similar effect.   In fact Thomas Reedy had never made such an admission, and he expected to be able to testify as to what he had actually said during the trial.   By not putting Reedy on the stand, and by not closely cross-examining Steed Huggins on the issue, defense counsel allowed this critical "evidence" to remain unchallenged in the trial.

68.     Finally, Terry Moore argued to the jury that "the 'Child Porn Click Here' banner would not be residing on the server at Landslide's business unless it was his banner.  Okay."   By failing to challenge this argument and, even more importantly, by failing to accurately explain to the jury how and why that banner appeared on the Sun server,

defense counsel once again allowed Ms. Moore to impose false arguments upon the jurors and this court, to the defendant's eternal prejudice.  Affidavit ¶ 13.

**CONCLUSION**

69.     The convictions of Thomas and Janice Reedy were won by the prosecution through the use of false arguments, enabled by false testimony from police officers and by the failure of defense counsel to adequately prepare for and cross-examine, prosecution witnesses.  Defense counsel also failed to present defense experts prepared to address the technical issues about which the police officers lied, even though the fallacies in the government's case were continually being identified for them by Thomas Reedy.

70.     The truth was available to defense counsel, they had only to listen to their own client.   If the reason that they failed to present adequate and properly prepared expert witnesses was financial, then perhaps their actions can be partially understood, for this court did refuse their request for adequate funding.   But in any case, they had the best and most knowledgeable witness of all, Thomas Reedy, available at no more cost than the time it would have taken to sit down with him and adequately learn to understand the finer points of the internet and computer fields that would be key to this trial, so that they could effectively use him as a witness.

71.     Defense counsel could also have easily shown that the FBI Agent, Frank Super, was lying about the dates and nature of his contacts with Thomas Reedy.  Witnesses and records were easily available in November of 2000, when the trial was held.  Had counsel gone to the little trouble that gathering such proof would have required, they would have been able to show that the entire prosecution case was built on lies, for the only

21

reasonable explanation for Agent Super's false story is that the prosecution needed to hide the truth about Thomas Reedy's communications with Frank Super from the jury, in order to maintain the case (and grab the million-plus dollars sitting in the Landslide bank accounts.)

72.     The transcript of the Reedys' trial is replete with federal police officers stating that they did not think that Landslide was engaged in unlawful conduct when they contacted Landslide for help in going after the real criminals—the Webmasters who were using Landslide's AVS system to market child pornography.   The record also reflects that Landslide sought out legal advice about what the child pornography laws allowed. Landslide, like every law enforcement officer with whom they came in contact, believed that what it was doing was legal.  Even toward the end, when Landslide was leaving obviously illegal images on its system, it believed it's actions were legal because it had been asked to do so by FBI Agent Frank Super.   The same Frank Super who testified that he first thought that there was nothing illegal abot Landslide's business, and whose supervisor concurred in that assessment.  The same Frank Super who later invented a transparently false story about how he first met Thomas Reedy, in order to hide the true version.

73.     It is telling that Frank Super did not come to the attention of Steed Huggins, the Postal Inspector who led this investigation, until after the searches when Thomas Reedy told Huggins about his earlier contacts with Super.   But by then the die was already cast: the warrants had been issued; the searches had occurred; a politically ambitious prosecutor saw her chance for glory; and several federal agents saw the possibility of a

headline-grabbing case that would promote their own careers.   All it took was a not-so-little white lie by Frank Super, and everybody but the Reedys stood to profit.

74.      It is time to see justice done in this case.  The convictions of Thomas and Janice Reedy (and of Landslide, Inc., as well) should be set aside and the charges dismissed, because the Reedys have been the victims of gross governmental misconduct and of ineffective assistance of counsel.

**DATED** this 8th day of January, 2007.


_____
                    Thomas Reedy

Southwest Legal Services
P.O. Box 57091
Tucson, Arizona 85732
(520) 795-1414

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Respondent, | ) | **Case No. 4:00-CR-054-Y** |
| | ) | |
| vs. | ) | Civil No. _____ |
| | ) | |
| THOMAS REEDY and JANICE REEDY, | ) | **AFFIDAVIT OF LARRY FASSLER** |
| | ) | |
| Defendants/Petitioners. | ) | |

I, Larry Fassler, make this affidavit in support of the Habeas Corpus Petition filed pursuant to 28 U.S.C. § 2255, under penalty of perjury, as follows:

1. I work for Southwest Legal Services in Tucson, Arizona, where my primary duty is to write books on federal criminal law. My books which have been published under the Southwest Legal Services name include *Busted by the Feds, a Manual for Defendants Facing Federal Prosecution*; *Como defender tus cargos federales* (in Spanish); and *Ineffective Assistance of Counsel*. They are advertised and sold primarily to the criminal defense bar.

2. As part of my duties, I also do some investigation and ghostwriting for criminal defense attorneys. I have done related work for many years, and I have written successful appeals and habeas corpus motions in many federal courts, including the U.S. Supreme Court, during my career.

3. Southwest Legal Services was retained by Forrest Reedy, the father of Thomas Reedy and the father-in-law of Janice Reedy, to investigate and assist in the preparation of their Motions to Vacate pursuant to 28 USC § 2255, and I was assigned to handle the case. In the course of my work I have discovered and/or determined each of the facts set forth in the following paragraphs, which I set forth herein as true and accurate.

4.  I was also trained and worked as a computer programmer in the period between 1969 and 1974, and I have a good fundamental understanding of how computers work.  Although I am not expert in modern computers and modern software, I am easily able to understand most technical explanations about basic computer-related matters, and I have been able to put that ability to good use in my investigation into the facts of the Landslide case.

5.  Because the Reedy family is unable to pay the normal fees and costs which are needed to prepare this case for presentation to the court, I will where appropriate describe the available evidence, which can be secured and presented at a hearing into this matter; but I am unable, for lack of funding, to present such evidence to the court concurrent with the filing of this affidavit and accompanying petition.  I do, however, represent to the court under oath that any such evidence does actually exist, and is available upon proper process or upon payment of the requisite costs.

6.  On October 5th, 2005, Michael Mead testified in the Crown Court at Northampton, Leicester, England, that he had done the web surfing and recording that Steve Nelson claimed to have done in the Landslide trial.  If Mead was testifying truthfully in England, then perforce Steve Nelson lied during the Landslide trial.   I have the transcript of this testimony, and others, to present at a hearing on these Motions.

7.  I have carefully checked the exhibit presented by Steve Nelson as the Landslide homepage, containing the banner ad CHILD PORN CLICK HERE, have analyzed the urls contained on the exhibit, and have compared it to other website images which I obtained from the historical internet records on web.archive.org.  The exhibit presented at the Landslide homepage is actually a composite consisting primarily of a portion of another web page, and is not a representation of the Landslide homepage.

8.  When I traveled to Fort Worth in July 2006, I obtained copies of many documents, including police reports and police personnel documents, and communications between Terry Moore and Wes Ball, that set forth the true facts about Michael Marshall and his history.  Those documents are available for production at a hearing into these motions.

9.  I have examined the rotating banner ad system used by Landslide in 1999, and have determined that it did not work in the manner described by Michael Marshall at the Landslide trial.  I also determined that the banner system was in fact intended to be open to use by parties other than Landslide, in contradiction of the testimony at trial by Michael Marshall.   I also determined that the method by which the Landslide banner system worked was not the same as the method described by Mr. Marshall.  I cannot determine whether Mr. Marshall's errors were the result of deliberate deceit or of simple ignorance.   I did also determine that the facts I had discovered were known to Thomas Reedy at the time of trial,

and that he had tried, unsuccessfully, to have them presented to the jury as impeachment of Marshall.

10. I have caused forensic examinations to be done on the backup copies of Landslide disks and tapes that I obtained from Wes Ball in Fort Worth during September 2006.  Those examinations found several emails that mentioned or referenced the cooperation in place between Landslide and FBI Agent Frank Super as to illegal child images found by Landslide on their system.  Those images also undoubtedly exist on the original copies of the files that are in the possession of the prosecution.  I have copies of the emails for production at a hearing on these motions.  The testimony at the trial by Dane Ritcheson, to the effect that no such records could be found, was incorrect.  Had defense counsel conducted similar examinations of the backup files before trial, he would also have been able to find the emails that support Mr., Reedy's story, and he would have had a compelling defense.

11. I traveled to Fort Worth in July 2006 and again in November 2006; both times seeking proof of the date when Landslide moved from its earlier offices on the south side of Belknap street to offices on the north side, in order to impeach the trial testimony of Frank Super.  I was able to determine, and find witnesses and records to present at a hearing, that the move occurred on or about March 1st, 1998. I was also able to establish that Carol Clark did not begin to work for Landslide until June 16, 1998.  Moreover, I was able to determine that the website Child God, which Agent Super testified he was investigating in August 1997, did not enter the Landslide system until approximately April 1999.  These facts are all inconsistent with the trial testimony offered by FBI Agent Frank Super, but *are* consistent with the story that Thomas Reedy wished to tell to the jury.   They were also all easily available to defense counsel at the time of the trial, had counsel sought them out.

12. I looked into the banner ad which Terry Moore told the trial jury was housed on the Sun 1 computer belonging to Landslide; thereby, according to Moore, "proving" that there was an agreement between Landslide and the Webmasters to broadcast the banner ad.   I was able to determine that the banner ad was not in fact resident on the Sun 1 computer, and that the image found by Dane Ritcheson was almost certainly just a remnant copy of the banner placed in the rotating queue by a webmaster at some time after Landslide had turned off the rotating banner ad system.

13. I was able to determine that the banner ad was not residing on the landslide computer server as argued by Terry Moore. I was also able to determine  two possible explanations for the image of that banner that Dane Ritcheson found on that server.  These finding were not difficult to make, and defense counsel had all of the required information and access available to them prior to and during the Landslide trial.

14. I found an article that appeared in the English edition of PC Pro magazine, by an eminent English forensic computer expert, that explained how American law enforcement agents, primarily Steve Nelson, have been repeatedly giving false testimony to the English courts.  A copy of that article is attached as Exhibit A hereto.

15. I found several European trials in which Steve Nelson, Mike Marshall, and other American law enforcement agents testified.  I am now in control of transcripts from some of those cases, showing that the agents, and especially Steve Nelson, have repeatedly lied under oath.

16. I have reviewed the testimony of Steve Nelson and of Michael Marshall in the Landslide trial, and have compared their testimonies wherever possible to demonstrable facts.  In so doing I have been able to establish that both Nelson and Marshall lied to the Landslide jury about material matters, and that their lies were consistently prejudicial to the defense in this case.  Most of these items could also have been easily discovered and presented at trial, had defense counsel pursued he matter.  Defense counsel actually had a better opportunity to find the true evidence, because they had Thomas Reedy immediately available to consult with them.

17. I have thoroughly read the record of the Landslide trial, and have reached an opinion, based upon my forty or more years experience reading criminal appeals, that virtually all of the most telling points against the Reedys made by Assistant U.S. Attorney Terry Moore in the Landslide trial were based upon false or misleading testimony by prosecution witnesses, or were based upon misstatements of fact by Ms. Moore herself.  In my opinion, had defense counsel at trial taken advantage of the readily available evidence to impeach Frank Super, and or Steve Nelson or Michael Marshall, or had counsel put on Thomas Reedy to testify and rebut the testimony of Steed Huggins, the outcome of the trial would likely have been different.  Had Mr. Reedy been allowed to testify as to his agreement with Agent Super, and had Agent Super's false testimony been exposed, it is more likely than not that the defendants would have been acquitted by the jury.

I hereby affirm that that the contents of this affidavit are personally known to me and are true and aaccurate.

DATED this 8th day of January, 2007.

State of Arizona

County of Pima

On this 8 day of January, 20 07, before me personally appeared Larry Fassler (name of signer), whose identity was proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this document, and who acknowledged that he/she signed the above/attached document.

(seal)

Larry Fassler

Michelle A. Delsid
NOV 29 2010

OFFICIAL SEAL
MICHELLE A. DELSID
NOTARY PUBLIC-ARIZONA
PIMA COUNTY
My Comm. Exp. Nov. 29, 2010



# Operation Ore exposed

## Operation Ore is the UK's biggest ever IT crime investigation, but expert witness Duncan Campbell reveals that many prosecutions were founded on falsehoods

They arrive without warning at six in the morning. Drowsily rising, Adam Smith finds two polite, suited men. 'Police. May we come in?'

The scene starts to shift. 'I am arresting you on suspicion of possessing and distributing child pornography. We have a search warrant.' Behind their backs, Smith sees a flurry of others moving in. They're firm but not aggressive – they know they're dealing with a middle-class, educated professional with no criminal history.

A female officer corners his wife and asks her if she knew her husband was a paedophile. Would she please make up an excuse for the kids not going to school today? A family social worker will be coming over to interview them – in case her husband has been abusing his own children.

Politeness is maintained at the police station. Booked in, interviewed. They ask him to confirm his credit card number and the email addresses he used in 1999. They show him a copy of a credit card bill they've already got from his bank. They point to a payment to Landslide Productions. 'You paid for child pornography; that's what that is.' He says 'no' and that he's never heard of that company.

The facts they put so confidently seem to fit, except that Smith has never had any interest in children other than being a good dad.

In one day, for no cause he can understand, Smith has become a pariah, one of the most hated, baited people in the country, a suspected child-molesting paedophile. In the months ahead, it will only get worse.

Even if his computer is eventually found to contain nothing more sexually unusual than the proportions of Samantha Fox, he faces months of fearing trial, stigma and possible jail, accused merely of 'inciting' the sale of child porn, based solely on computer data found years ago in a Texas office block.



The PowerPoint briefing showing a portion of a web page wrongly assumed to be Landslide's homepage.

**MASS ARRESTS**

Operation Ore launched on British TV screens on 20 May 2002. The BBC led on 'mass arrests over online child porn'. Thirty-six people were arrested, with promises of thousands more to follow. It made for compelling television, and provoked a rash of tabloid activity, but it also led to increased pressure on the police to bring the remaining thousands to justice.

Unfortunately, not all the evidence presented was quite as clear cut as it seemed. Clearly visible on the bulletin was a computer screen displaying Exhibit One of Operation Ore. In the middle of the screen were the words 'Click Here CHILD PORN'.

According to witness statements sworn by the US detective Steven Nelson and US Postal Inspector Michael Mead, this was the front page of Landslide Productions Inc, a company at the centre of child porn allegations. To go further, they testified, those prosecuted must have clicked on 'Enter'. They'd then be taken to a page that proclaimed itself as 'the most controversial site on the Web ... no legal content ... phedophilias [sic]... all sick, all sex maniacs'. Click on and they'd be taken to 'Lolita World', and from there, said Nelson, to a host of child porn websites offered by Keyz, a separate service offered by Landslide.

The Metropolitan Police Paedophile Unit

let the BBC cameras in on the planning process for Operation Ore raids for a series shown a year ago: 'Police Protecting Children'. At the start of the show was a PowerPoint briefing for the raiding teams. Slide 1 showed the 'Click here' banner, with the legend 'First they are into an adult site. And choose to go to a child site' (*see image, left*).

To British police and prosecutors, this was killer evidence. It meant everyone who had been to Landslide had knowingly chosen to access child porn. It meant that everyone who had subscribed to the site must automatically be guilty.

However, this most critical computer evidence produced in Operation Ore, I have found, was flawed. On 2 October 2002 in Fort Worth, Texas, incorrect evidence was handed to a British police officer by Nelson. He swore it as true evidence and was backed up by Mead. The evidence was then distributed throughout Britain, shown on TV and paraded in courts up and down the land.

The objective of Operation Ore was the protection of vulnerable children from adult abuse and harm. But the mistakes meant huge quantities of police, technical and social work resources were misdirected to some futile and ill-founded investigations. The worse result was damage to innocent lives, and the welfare of families and children.

**WIDESPREAD DISGRACE**

In Britain to date, 4,283 people and their families have had experiences similar to 'Adam Smith', and another 3,000 computer users still on the Operation Ore target list could face similar treatment.

If any one of these people hasn't been broken by the experience, no-one I know is aware of them. Many have contemplated self harm under the toxic pressure of these investigations, and some have seen it through. On 8 January 2005, Royal Navy commodore David White, commander of British forces in Gibraltar, took a one-way trip into his

*Exh. A*





■ **Duncan Campbell** is an investigative journalist specialising in privacy, civil liberties and secrecy issues. His best-known investigations, including uncovering the existence of the GCHQ, have led to major legal clashes with successive British governments. Here he writes exclusively for *PC Pro* following his involvement as an expert witness in a number of Operation Ore investigations. Email: iptv@cwcom.net

swimming pool. He was the 33rd such victim of Operation Ore.

Britain's experience hasn't been alone. The same events have been repeated around the world. In Ireland, Canada, and Australia, similar tragedies and deaths have occurred.

Their common cause was a 1999 police operation in Fort Worth, Texas. Billed as the exposure of the world's largest 'paedophile ring', America's 'Operation Avalanche' had swelled by 2002 to a global crusade.

The entire investigation depended on computer evidence. What was on the Internet, who logged in to it, when and how? On this digital sword, many lives and careers would be tested and some would end.

### LANDSLIDE GOES DOWN

Detective Constable Sharon Girling of the National Crime Squad, honoured with an OBE in the 2005 New Year's honours list, is a stalwart police footsoldier in the investigation of paedophile activity on the Internet. Her first big computer case, Operation Cathedral in 1998, involved an unquestionably savage group of men who exchanged images and videos of children being abused and violated. DC Girling was employed to track down some of the child victims. And it was this work that led to her being given a starring role in the 2000 Texas trial of Thomas and Janice Reedy, who founded Landslide in 1996.

Ironically, Landslide was set up in response to the US Communications Decency Act of 1996, which seeks to prevent minors from seeing sexually explicit adult material on the Net. The industry came up with a simple, effective answer: blocking access to adult sites except for people who could prove they were old enough to have a credit card. Subscribers paid a small annual fee to one of these merchants and were given a password and ID for a range of porn or sex chat sites. Generally called Adult Verification Services (AVS), they continue to flourish.

Late in 1998, Landslide branched out to new porn services with a service called Keyz. With AVS, people might buy six months' access to over 5,000 sites for about $50. With Keyz, they paid for access to only one site, perhaps for as little as a week. By the time Landslide was closed down, there were nearly 400 sites available through Keyz: some were adult, and some were clearly about children.

In the spring of 1999, the National Center for Missing and Exploited Children

(NCMEC) complained to the US Postal Service (which polices the Internet in the US) that Landslide's Keyz service was providing access to child porn sites.

NCMEC's complaints were accurate and in May 1999 Dallas Detective Steven Nelson began a covert investigation. During the summer, he bought 12 subscriptions in a false name. After getting his passwords, he hooked his computer up to a simple spider program called Web Buddy. He filled his drive with the contents of each site, at least to the extent that the links worked. Then, with the assistance of Postal Inspector Michael Mead, Nelson prepared to raid Landslide. This was Operation Avalanche.

On 8 September 1999, the Feds hit Landslide's offices at Seaman Street, Fort Worth. They seized two Sun computers and everything digital in sight. Initially released on bail and bullish, the Reedys protested their innocence and carried on trading in adult porn. They hadn't been supplying child images themselves, they said, but had only provided a portal to other sites. The actual suppliers – the child porn webmasters – were beyond the reach of the USPIS, in south east Asia, Russia or its republics. When Landslide closed, they took their sick trade elsewhere. They were never apprehended, whereas the Reedys were convicted of 89 offences of possession and distribution of images of children. Eight

subscribers to the adult verification service were lumped in with those who had paid for or requested Keyz sites, of whatever kind.

With Reedy incarcerated, the US cops set about sharing the data they had found. The names of subscribers to every site were sorted by country and sent out through Interpol. Each package contained details about Landslide that suggested that all those identified were to be treated as suspect child abusers.

The US government approached its citizens differently from Britain. Instead of branding every name on the list as a paedophile, officials carefully profiled and investigated selected individuals against whom there was fresh evidence of making indecent images of children or of actual abuse. In respect of the 35,000 US records, only 144 houses were searched and 100 people charged with the trafficking of child pornography through the mail and via the Internet.

When the USPIS packets reached Britain, the National Criminal Intelligence Service (NCIS) launched Operation Ore, a

## A Texas court sentenced Reedy to 1,335 years of imprisonment – 15 years consecutive imprisonment for each image and video

months later, a Texas court sentenced Reedy to 1,335 years of imprisonment – 15 years consecutive imprisonment for each image and video that Nelson had grabbed with his Web Buddy software (although the sentence was later reduced to 180 years).

### A MATTER OF RECORD

On examining the Landslide computers, the USPIS found that Landslide had kept a record of hundreds of thousands of transactions in its databases. There were also gateway links to 5,700 websites around the world. Of the 390,000 subscription transactions, 35,000 related to the US itself. The rest were spread around the world, including 26,462 transactions with 7,272 individuals in the UK. Landslide only operated one SQL database, so

large, costly, high-profile police operation and Britain's biggest ever computer crime case. Fraud, even murder cases, had sometimes to take second place to the tide of potential child porn filth to be checked.

Except, all too often, it wasn't. After days or weeks of imaging hard disks, enduring home videos, and scrolling through recovered images and fragments, there might be nothing. Or, after all that work, they might find images of a few girls in a porn trove of thousands of pictures, whom a court might think under rather than over 16. Perhaps some deleted thumbnails of actual children that had been delivered, unknown to the user, as pop-ups from a malicious page they chanced to visit.

Good evidence was found in many ▶



A reconstructed screen using the Internet Archive and Paint Shop Pro to place the 'click here for child porn' banner, as it would have appeared to investigators...



...but only the bottom of the screen was used as evidence. Cases against many defendants have claimed what was left was the permanent Landslide front page.

cases. Even if after three years there was no record of original transactions with Landslide on the seized computers, there might be subdirectories filled with clearly prepubescent images, and Internet search histories on Google or elsewhere into which the user had typed incriminating terms.

### COMPUTER FORENSICS

Evidence from good computer forensics is frighteningly compelling. Encase, the most widely used software search tool, can plunder a hard disk for incredible amounts of buried and lost detail left behind by Windows. Original directories in a reformatted drive can be recreated, long lost Internet histories brought to life, and cache images once glimpsed years earlier served up. On any computer connected to the Net, especially without competent protection, illegal child images can just turn up. In two cases where I worked as a computer forensic expert, the police found a handful of child images. This was prima facie evidence. Both men were committed to Crown Court for trial.

But Encase can work for both sides. Pull down the timeline of the thousands of indexed fragments it finds and you may discover the HTML code that carried the offending pictures. Look back a few seconds and you could find previous HTML and within it the window open commands that can mark unwanted pop-ups. When this was pointed out, the Crown Prosecution Service withdrew its case.

But by this time, the innocent and acquitted were immensely harmed in their private and personal lives, perhaps having lost employment, income, friends and reputation. Many Ore defendants haven't been fortunate enough to be well advised, legally or technically. Under pressure to get results and to get on, many police forces asked defendants to plead to minor charges or accept a caution. With no prison sentence, not even a fine, it may sound like an easy way out. But with every caution or conviction comes mandatory membership

of the Sex Offenders' Register, and with that the certainty of stigma and the enduring fear of public exposure.

### OPERATION FLAWED

The clues to the flaws in the evidence were there for those with the eyes to see. Look again at the image on p152, exhibit 'SAN/1'. It's a slightly blurred photograph (not a screen grab) of a Windows 98 machine running Internet Explorer. Look at the right-hand side. There's a slider bar, showing that what's being seen is less than one-third of the full page. The top and most of the contents are missing. The image has been cropped, concealing most of the page.

Look again, this time at the web address space below the toolbar. The front page address for Landslide was **www.landslide .com**. This isn't it. Whatever is in the blur, it's too long to be the Landslide front page address. When I saw this image a year ago, I knew something was very wrong with the evidence.

Unknown to the Texas detectives, there's another place where you can get at the Internet's historical truths. The Internet Archive, also known as the Wayback Machine (**www.archive.org**), is a not-for-profit foundation based in San Francisco. The Archive's computers have been crawling the Web since 1996, building a huge, searchable historical archive. The Archive, I found, had recorded what the Landslide website really looked like in 1999.

From the Archive, I retrieved a series of

## Evidence from good computer forensics is frighteningly compelling. Incredible amounts of buried and lost detail can be plundered

front pages from Landslide's beginnings in 1996 through to April 1999, just before the police investigation began. There were no 'child porn' buttons nor any place where one could be. I also found the real page that had, one occasion only, displayed the notorious banner. Located at **www.avs. landslide.com/avs/index.html**, it was an internal page for Landslide's adult AVS service. At the very bottom of the page were two advertising spaces, controlled by a third-party banner swap service. ►



 

These are the real front pages to Landslide's site: left, as found by detective Nelson and the second using the Internet Archive. There are no links to child porn on either.

Whatever banners appeared there were not – could not – have been part of Landslide or Keyz.

The screenshots on p154 show the reconstructed Landslide AVS page, and the cropped version used for evidence.

I wasn't the first person to spot this. In January 2003, as the Ore raids mounted into the thousands, the National Crime Squad in London received copies of all the computer files used for the 1999 US investigation. Among the computer files were copies of web pages recorded by Nelson. One file was a copy of the real Landslide front page, dominated by the company's logo (see screenshot above left).

On 5 February 2003, Detective Constable Girling circulated a short witness statement, setting the record straight and producing the real Landslide front page.

NCS passed the US computer files to a specialist computer forensic company called CELT, with instructions to rebuild the Landslide and Keyz web pages. At CELT, expert Dr Sam Type found more contradictions to the American evidence. Nelson and Mead had both sworn statements that Keyz websites could be reached from the Landslide homepage. 'Absolutely no way,' reported Dr Type. After rebuilding the site, she dismissed the idea that Keyz was a service devoted to child porn.

In a further report in November last year, Dr Type confirmed that the 'Click here' child porn advertisement was never seen on the Landslide front page. It was 'actually the AVS front page', she wrote. The 'child porn' banner ad, she found, wasn't on any of Landslide's computers; it had come from elsewhere.

## KEY WITNESS

This February, a British court required Mead's attendance for an Operation Ore case. He gave evidence by means of a satellite video link from Texas to the Crown Court in Derby. On oath, Mead stated that he and Nelson had only ever seen the 'Click Here Child Porn button' appear once, at the very start of their investigation. He accepted that the photograph only showed part of the page. 'The child porn link was at the bottom,' he said.

He was asked: 'In June 1999, it is likely that the 'Click here for child porn' was not on the Landslide's homepage?'

'Correct,' he replied.

The Derby jury found the defendant not guilty. Although his barrister forbore to say so, Mead's admissions took apart the impression Nelson had given two years before. Mead had previously backed up Nelson's story. In a sworn statement given to a British police officer in 2 October 2002, Mead had said: 'During the time we monitored the website, the banners did not alter in any way.' He had changed his story.

## TRIAL OF THE MIND

Establishing these errors doesn't mean that everyone suspected in Operation Ore was falsely and unfairly accused. Far from it. But the issues revealed above have been combined with carelessness, a media rabble and a tabloid-feeding frenzy to produce systematic injustice.

My work so far has led to three Ore

defendants being acquitted and to all the American evidence being ditched in respect of a fourth. But even for those never charged, or acquitted before trial, the experiences are so scarring that no-one wants to talk.

The sole exception I've encountered is a man who runs his own computer-programming company. Like many men, from time to time he'd signed up for adult images on the Net. In the summer of 1999, he saw that his credit card details had been used over and over again on the Landslide website. He complained quickly, got a full refund and thought no more of it. Until the knock on his door three years later.

'It's a trial of the mind,' he said. 'I lost mine at the time. If people are guilty, they can say to themselves, yes, been there, done that. But if you haven't, then it's impossible to make sense of what's happening to your life.'

When he proved to the police that the information he'd given for adult access had been stolen and then reused at Landslide to send money to child porn merchants, he was

## Even for those never charged, the experiences are so scarring that no-one wants to talk

told that he was innocent. He'd had to wait, but 'it was less than two months, investigated, cleared, no issue'.

## LEGAL AFTERMATH

The records suggest that because of the media and police enthusiasm to hunt down supposed Internet paedophiles, important questions about the evidence were never asked, or asked in time. As recently as last December the police were still unwilling to admit to the House of Commons that thousands of names on the Landslide list were not paedophiles and were known to have paid only for adult material.

Through no fault of their own, many people and their families will never recover from the false stigma of having been associated with child pornography. They are the victims of a combination of technical naivety and fear, fed by a media circus demanding fast results and the exposure of big names. As the Internet continues to become more transparent, the risk is that the stage may be set for a 21st century witch-hunt.

*The report of the police raid on Adam Smith is fictitious but based on many similar accounts.* ■

